**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| THOMAS K. KURIAN,<br>Plaintiff,<br>vs.<br>SNAPS HOLDING COMPANY,<br>Defendant. | Case No.: 2:19-cv-01757-GMN-EJY<br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, and DECISION** |
| SNAPS HOLDING COMPANY,<br>Counter-Claimant,<br>vs.<br>THOMAS K. KURIAN,<br>Counter-Defendant. | |

This case involves an alleged breach of contract between Thomas Kurian and SNAPS Holding Company in which Kurian leased his spectrum license to SNAPS in exchange for monthly payment. The Court held a two-part bifurcated bench trial in this case: the first part of trial was held from September 23 to September 27, 2024, (Trs. Proceedings, ECF Nos. 192, 193, 198, 199, 203, 204, 206, 208, 211, 212); the second part of trial was held from January 12 to January 13. The Court rules in favor of SNAPS Holding Company on the following findings of fact and conclusions of law.

## I. BACKGROUND

The Court previously granted summary judgment for Kurian on his breach of contract and breach of the implied covenant of good faith and fair dealing claims, and granted summary

judgment for SNAPS on Kurian's fraud/misrepresentation claim and injunctive relief. (*See generally* Order Summ. J., ECF No. 55). The case first proceeded to trial on Kurian's international interference with prospective economic gain claim and the following SNAPS counterclaims: (1) unjust enrichment, (2) fraudulent misrepresentation, (3) negligent misrepresentation, (4) fraudulent inducement, (5) breach of the covenant of good faith and fair dealing, and (6) tortious interference with prospective economic advantage. (*See id.*); (*see also* Order Granting Mot. Clarification, ECF No. 59). Before trial, the parties submitted opening trail briefs. (Kurian First Opening Trial Br., ECF No. 160); (SNAPS First Opening Trial Br., ECF No. 165). Due to a disagreement between the parties regarding whether SNAPS' damages expert should be permitted to testify despite not having been included in the Joint Pretrial Order, the Court bifurcated the trial; the Court agreed to conduct the first part of trial to determine liability and the second part to determine SNAPS' damages. (*See* Second Mot. Limine, ECF No. 175); (Mins. Proceeding Bench Trial Day 1, ECF No. 179). Additionally, before trial, Magistrate Judge Youchah sanctioned Kurian in the form of an adverse inference that "the sale of a portion of Kurian's spectrum was not wholly unrelated to the spectrum that he contends was leased to SNAPS." (Order Denying Mot. Limine 4 n.1, ECF No. 167).

After the first part of trial concluded, the parties submitted written closing briefs. (Kurian First Trial Br., ECF No. 215); (SNAPS First Trial Br., ECF No. 216). Before the second part of trial, the Court vacated summary judgment previously granted for Kurian on his breach of contract and breach of the implied covenant of good faith and fair dealing claims in light of his testimony at trial, and included those claims during the second part of trial. (Order Reconsidering Summ. J., ECF No. 219). In doing so, the Court conducted the second part of trial to hear evidence on the reopened Kurian claims as well as SNAPS' damages. (*Id.*); (Order Regarding Trial, ECF No. 221). The parties then filed second opening briefs before beginning

the second part of the bench trial. (Kurian Second Opening Trial Br., ECF No. 227); (SNAPS Amended Second Opening Trial Br., ECF No 237).

During the second part of the bench trial, the Court heard evidence and legal argument. The parties did not submit written closing briefs after the second part of the bench trial concluded. Now, in accordance with Federal Rule of Civil Procedure ("FRCP") 52(a), and after reviewing the entire trial record, the Court makes the following findings of fact and conclusions of law regarding the parties' remaining claims.

## FINDINGS OF FACT

1. In April 2014, Thomas K. Kurian and SNAPS Holding Company ("SNAPS") began negotiating the terms of a Spectrum Manager Lease Agreement ("Agreement") regarding Kurian's FCC license for wireless spectrum frequencies identified by call sign WQCP809.
2. During negotiations, SNAPS expressed reluctance to agree to Kurian's term regarding compliance with the FCC's substantial service and construction requirements, as they anticipated the need for additional time to develop their technology and prepare their business operations.
3. The parties executed the Agreement on May 19, 2014, granting SNAPS the right to use certain frequencies of the License in designated geographical areas, as detailed in Exhibit A of the Agreement. (Agreement, Pl.'s Trial Ex. 1). The Agreement granted SNAPS an option to purchase the entire call sign, WQCP809 (upper and lower band spectrum), for $10,194,996.00.
4. According to the Agreement, Kurian leased to SNAPS the exclusive right to use the Channels specified in Exhibit A of the Agreement. The Agreement identified the lower and upper bands as being associated with the call sign but made no distinction

as to the lower and upper bands of the spectrum in the Exhibit. The lease filing with the FCC included both bands. No partition of the call sign was made at this time.

5. The lease was not immediately filed with the FCC as Kurian did not want to draw attention until SNAPS was fully commercially operational. (June 2014 Emails, Def.'s Trial Ex. 114) ("As discussed and agreed between us, we will hold any filing at FCC until you are ready to operate commercially in order to avoid any type of unwanted attention."). This evidences Kurian's understanding that SNAPS would not be able to meet the substantial use clause and deadline in the parties' agreement.
6. In exchange for the exclusive use of the specified frequencies, SNAPS agreed to pay Kurian a monthly Spectrum Fee of $20,390.00, effective from June 1, 2014. (Agreement ¶ 4, Pl.'s Trial Ex. 1)
7. The Agreement also stipulated a default provision requiring 30 days' written notice prior to termination. Section 12(a) of the Agreement obligated Kurian to maintain the Channels in full force and effect and prohibited actions that could materially adversely affect the Channels or the parties' ability to perform under the Agreement. (Agreement ¶ 12, Pl.'s Trial Ex. 1)
8. SNAPS executed the Agreement to develop a customized technology and solution network, which was integral to its business operations. Kurian was aware of SNAPS' intent to use the Channels for its commercial operations at the time of entering into the Agreement.
9. In January 2015, without notifying SNAPS, Kurian filed a Compliance Renewal Application with the FCC to renew the Spectrum License through April 2025.
10. On March 26, 2019, without notice to SNAPS, Kurian applied to the FCC to cancel SNAPS' Lease of the Spectrum License. (Def.'s Trial Ex. 116 at 178) ("Did you fill out an FCC Form 608 in order to cancel the SNAPS spectrum lease agreement? Yes, I

did fill out an applications. And I submit it on 3/26/19 with an action date of 3/27/19.").

11. On March 27, 2019, Kurian sent an email purporting to terminate the Lease, citing SNAPS' alleged failure to meet substantial service and payment obligations, and denying Kurian's inspection rights.

12. On June 27, 2019, Kurian filed a Complaint in the Eighth Judicial District Court alleging six causes of action: (1) breach of contract; (2) fraud/misrepresentation; (3) interference with prospective economic gain; (4) breach of the covenant of good faith and fair dealing (contractual); (5) declaratory relief; and (6) injunctive relief. (Compl., ECF No. 1, ¶¶ 6–30). SNAPS subsequently removed the case to this Court on the basis of diversity jurisdiction. (Pet. Removal ¶ 5). SNAPS filed an Answer, which was later amended to include seven counterclaims: (1) breach of contract; (2) unjust enrichment; (3) fraudulent misrepresentation; (4) negligent misrepresentation; (5) fraudulent inducement; (6) breach of the covenant of good faith and fair dealing; and (7) tortious interference with prospective economic advantage. (Am. Answer ¶¶ 22–70, ECF No. 30).

13. As discovery progressed, SNAPS uncovered public filings that hinted at a potential transaction between Kurian and a third party, PTC-220, LLC ("PTC-220"). These filings suggested that Kurian might have engaged in negotiations or even completed a sale of a portion of the licensed spectrum, a transaction that had not been disclosed to SNAPS or the Court. (ECF No. 75-1, at 17.)

14. On December 9, 2022, in response to SNAPS' inquiries, Kurian's counsel, E. Brent Bryson, Esq., categorically denied the existence of any such agreement, stating, "[f]or the last time there is no agreement." (ECF No. 75-1 at 42.)

15. In fact, there was an agreement. Kurian began the sale to PTC-220 by filing a partition and assignment application with the FCC on July 16, 2019. (ECF No. 75-1, at 17). SNAPS requested a copy of the sales contract from Bryson at 9:35 AM on December 9, 2022. (ECF No. 145, Ex. B at 6.)

16. On December 13, 2022, Magistrate Judge Youchah ordered Kurian to produce all documents related to the transfer of interests to PTC-220, including any contractual documents, communications, and evidence of consideration received. (ECF No. 73 at 22).

17. Despite Judge Youchah's order, Kurian failed to produce any relevant documents, prompting SNAPS to issue a subpoena to PTC-220 on January 13, 2023. PTC-220's response confirmed the sale of the spectrum, including a Purchase Agreement for $11,575,920 and extensive communications. (ECF No. 145, Ex. C); (PTC-220 Agreement Emails, Def.'s Trial Ex. 108). The documents demonstrated that Kurian began discussions regarding the sale to PTC-220 as early as October 2018, prior to beginning the process of terminating the Agreement with SNAPS.

18. The discovery also revealed that Kurian attempted to prevent compliance with the subpoena, expressing to PTC-220 that releasing the agreement would cause him immense hardship and urging them to "avoid doing so at any cost." (PTC-220 Subpoena Emails, Def.'s Trial Ex. 110). He also told PTC-220 that he would never reveal the contract to any court. (*Id.*) ("I [never] told FCC nor any other authority/court anything about any type Agreement nor I plan to do so [sic]. I simply don't recollect any type of Agreement. So please keep this transaction private and please avoid talking anything about this transaction to any third party.").

19. SNAPS filed a Motion for Order to Show Cause against Kurian and Bryson, seeking case-dispositive sanctions for their failure to disclose critical documents. In response,

Kurian and Bryson offered various justifications, including claims that the nondisclosure agreement with PTC-220 precluded production and that they had no knowledge of the agreement until it was produced by PTC-220. (ECF Nos. 74, 86, 104).

20. Magistrate Judge Youchah sanctioned Kurian by awarding SNAPS its attorneys' fees and ordered him to supplement discovery with documents related to the sale to PTC-220 that might mitigate damages owed by SNAPS. However, Judge Youchah did not find clear and convincing evidence of bad faith sufficient to warrant terminating sanctions. (ECF No. 104 at 36).

21. Prior to trial, Magistrate Judge Youcach sanctioned Kurian in the form of an adverse inference that "the sale of a portion of Kurian's spectrum was not wholly unrelated to the spectrum that he contends was leased to SNAPS." (Order Denying Mot. Limine 4 n.1).

## CONCLUSIONS OF LAW

This case proceeded to trial on both claims and counterclaims. Kurian asserts three claims against SNAPS for which he put on evidence at trial: (1) Breach of Contract, (2) Intentional Interference with Prospective Economic Gain, and (3) Breach of Covenant of Good Faith and Fair Dealing. SNAPS put on evidence in support of its six counterclaims: (1) Unjust Enrichment,[1] (2) Fraudulent Misrepresentation, (3) Negligent Misrepresentation, (4) Fraudulent Inducement, (6) Breach of the Covenant of Good Faith and Fair Dealing, and (7) Tortious Interference with Prospective Economic Advantage. The Court begins by addressing Kurian's claims before turning to SNAPS' counterclaims and damages.

---

[1] Though SNAPS asserted a counterclaim for unjust enrichment, (Answer ¶¶ 34–38, ECF No. 30), it failed to make any argument on this claim at trial or in its closing trial brief, (*see generally* SNAPS First Post-Trial Br., ECF No. 216). Having received no argument in support of this claim, the Court grants judgment as a matter of law in favor of Kurian on this claim.

**A. Kurian's Claims**

Kurian asserts three claims against SNAPS: (1) Breach of Contract, (2) Intentional Interference with Prospective Economic Gain, and (3) Breach of Covenant of Good Faith and Fair Dealing. The Court analyzes each claim in turn.

**1. Breach of Contract**

A plaintiff claiming breach of contract must show: (1) the existence of a valid contract between the parties; (2) the plaintiff's performance; (3) the defendant's material failure to perform; and (4) damages resulting from the failure to perform. *See* Restatement (Second) of Contracts § 203 (1981); *Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000). Kurian alleges he performed his duties and obligations, but SNAPS failed to do so by: (1) failing to pay monthly payments in a timely fashion and failing to pay the March 27, 2019, payment; (2) failing to pay the remaining months under the parties' contract; (3) failing to "build out" the leased channels; (4) failing to provide Kurian with oversight; (5) failing to allow Kurian to inspect SNAPS operations; (6) failing to construct and operate to provide coverage to 40% of the population for the regions; (7) failing to operate equipment pursuant to FCC authorization and approval; (8) failing to provide engineering studies as per FCC regulations; (9) operating from six sites without FCC and Kurian's approval; and (10) failing to keep the parties' dealings confidential.[2] (Kurian Second Trial Br. 5:8–20, ECF No. 227).

At summary judgment, the Court previously found that the contract was valid. (Order Summ. J. 7:13–9:17). The Court did not vacate that finding when it vacated summary judgment on this claim and continues to find that there was a valid contract between the parties for the reasons explained in the Order on Summary Judgment. As to the second element,

[2] While Kurian asserted that SNAPS violated the confidentiality agreement in his trial brief, opening statement, and closing statement during the second part of trial, he failed to identify any specific action that would constitute breaching confidentiality. The Court therefore finds that he failed to meet his burden of showing that SNAPS breached the contract by failing to keep the parties' dealings confidential.

SNAPS does not appear to dispute that Kurian performed his duties and obligations. (SNAPS Closing Br. 36:19–37:26). Thus, the dispute is focused on whether SNAPS breached the contract in any one of the variety of ways Kurian asserts.

Kurian first asserts that SNAPS breached the contract by failing to pay monthly payments in a timely fashion and failing to pay the March 27, 2019, payment. Regarding the late payments, the Agreement provides that SNAPS must pay the monthly fee to Kurian by the "first day of each month." (Agreement ¶ 4, Pls. Ex. 1). At trial, Kurian testified that he "received every payment under the lease . . . up until February 2019," that he "received no payment in March," and that "all payments except in the first month were untimely." (Trial Day 2 Tr. 44:25–25:10). Because Kurian accepted all payments through February 2019, there was no material breach. Further, Kurian waived the requirement for timely payment through his conduct of accepting the late payments and cannot now seek to recover damages for late payments when he regularly accepted late payments for five years. (SNAPS Payment Problem Records, Pl.'s Ex. 16); *see Nevada Nat'l Bank v. Huff*, 582 P.2d 364 (Nev. 1978) (explaining that a party "who has not insisted upon strict compliance in the past, who has accepted late payments as a matter of course, *must*, before he may validly rely upon such a clause to declare a default . . . *give notice* to the [lessee] that strict compliance with the terms of the contract will be demanded henceforth").

As for SNAPS' failure to make the March 2019 payment, Kurian terminated the lease on March 27, 2019. SNAPS argues that it still had time to cure when the lease was terminated under the Default clause of the agreement, and it rightly did not pay after Kurian improperly terminated the lease. (SNAPS First Post-Trial Br., 37:22–23, ECF No. 216). The Court agrees. The Agreement provides that either party may terminate the Agreement upon the breach or default of the other party "if such breach or default continues for a period of 30 consecutive days after such party's receipt of written notice thereof from the non-breaching or non-

defaulting party." (Agreement ¶ 12, Pl.'s Trial Ex. 1). Kurian testified that he received the February payment, so SNAPS could not yet have been in consistent breach for 30 days for failure to make the payment due March 1. Kurian terminated the lease on March 27, 2019, partially for SNAPS' nonpayment in March. (Termination Notice, Def.'s Trial Ex. 122). Per the terms of the Agreement, Kurian could only terminate the lease for default after a breach continued for a period of 30 days after SNAPS received written notice of the breach. (Agreement ¶ 12, Pl.'s Trial Ex. 1). In short, per the Agreement, SNAPS' March nonpayment was not yet a material breach at the time Kurian terminated the contract.

Next, Kurian claims that SNAPS breached by failing to provide engineering studies as required by FCC regulations, "build out" the leased channels, and operate to provide coverage to 40% of the population for the regions. Per the Agreement, SNAPS was required to "provide substantial service by providing communication services to 40% of the Population in the leased geographical area using its Leased Channel on or before April 25, 2015 as per FCC rule 47 C.F.R. Part 80.49(a)(3)." (Agreement ¶ 6(b), Pl.'s Trial Ex. 1). Kurian contends that SNAPS failed to comply with this provision because it did not submit an engineering study required to get approval to start "building out" (that is, installing transmitting devices). (Day 1 P.M. Tr. 18:1–12)). Because it failed to submit the required engineering study, it then wasn't given permission to "build out" and begin providing substantial service as required.

First, Kurian waived the requirement for SNAPS to provide substantial service through his conduct of providing the substantial service himself and not terminating the lease as a result of SNAPS' alleged noncompliance. Kurian testified at trial that he filed for renewal of his spectrum lease in early 2015, and in that renewal, he certified to the FCC that substantial service was in place. (Day 5 A.M. Tr. 48:23–49:17, ECF No. 212). He stated that he took it upon himself to build out systems to ensure he remained in compliance. (Kurian Dep 131:13–15, Def.'s Trial Ex. 116). At trial, Kurian also testified that he never provided a notice of

default to SNAPS for failing to meet the April 25, 2015, deadline set in the lease. (*Id.* 49:23–25). These statements demonstrate that Kurian waived the substantial service requirement in the parties' lease.

Moreover, Kurian did not file the SNAPS lease with the FCC until after the obligation date in the parties' lease, rendering compliance with that deadline impossible. While the substantial service deadline was April 26, 2015, Kurian did not file the notification of the spectrum leasing arrangement with the FCC until February 9, 2016. (FCC Application, Pl.'s Trial Ex. 2). SNAPS could not have provided engineering studies to the FCC before the substantial compliance deadline because the FCC was not yet aware Kurian had leased the Spectrum to SNAPS. Without approval from the FCC, SNAPS could not legally build out or provide substantial service by the deadline provided in the lease. Indeed, the Agreement provides that SNAPS "shall not commence operations on the Channels until the earlier of 1) the date the FCC Notice is listed as accepted in the FCC's Universal Licensing System database, or 2) at least twenty-one (21) days after the FCC Notice is received by the FCC ("Closing Date")." Kurian's late filing of the lease with the FCC both constitutes waiver of the requirement and rendered compliance with these requirements impossible. *See Nebaco, Inc. v. Riverview Realty Co., Inc.*, 482 P.2d 305, 307 (Nev. 1971).

Kurian next argues that SNAPS breached the contract when it failed to provide Kurian with oversight and the ability to inspect SNAPS operations. The Agreement provides that "Lessor shall retain the right to inspect, upon advanced notice and at reasonable business hours, Lessee's premises if it reasonably believes that such inspection is necessary to ensure compliance with this Agreement, the Act, or the FCC's rules." (Agreement ¶ 9, Pl.'s Trial Ex. 1). Kurian fails to identify any evidence to support this claim. Moreover, according to Kurian's testimony at trial and the evidence he submitted at trial, Kurian did in fact conduct a site inspection a few days before Kurian terminated the lease. (Day 1 P.M. Tr. 31:18–33:5);

(Day 2 Tr. 47:22–48:4); (Photo, Pl.'s Trial Ex. 18). While Kurian had sent a list of proposed site inspections to SNAPS, (Site Inspection Email, Pl.'s Ex. 7), Kurian terminated the lease prior to those scheduled inspections, (Day 2 Tr. 41:4–19). Because Kurian did inspect one of SNAPS' sites and terminated the lease prior to his requested site visit dates, he has not met his burden of establishing that SNAPS breached the contract by preventing Kurian from inspecting and having oversight over SNAPS' operations.

Lastly, Kurian contends that SNAPS violated the Agreement by operating from six sites without his or the FCC's approval. To begin, this claim is in direct conflict with Kurian's own email to SNAPS explaining his basis for termination, which stated that he saw no transmission in any of the lease channels. (March 2019 Email, Def.'s Trial Ex. 123 at 2). Additionally, the only evidence Kurian put on to support this claim is a photo of equipment that he testified belonged to SNAPS and demonstrated SNAPS was operating without approval. (Photo, Pl.'s Trial Ex. 18). Meanwhile, Patel testified that the equipment in the photograph was unrelated to the lease frequencies. (Day 3 Tr. 102:4–22, ECF No. 198). Without additional evidence, Kurian's sole photograph for which Patel provided an alternative explanation is insufficient to meet his burden of showing SNAPS breached by operating without approval.

### 2. Intentional Interference with Prospective Economic Gain

To succeed on his Intentional Interference with Prospective Economic Gain claim,[3] Kurian must demonstrate the following five elements:

> (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.

---

[3] In his second opening trial brief, Kurian states that he dismissed this claim in his motion for summary judgment. (Kurian Second Opening Trial Br. 7:8–9, ECF No. 227). This claim is inconsistent with Kurian's briefing for the first part of trial which specifically addressed the merits of this claim. Moreover, because Plaintiff has not amended his complaint to remove this claim, he has not properly "dismissed" it. Fed. R. Civ. P. 15. Accordingly, this claim remains, and the Court analyzes its merits.

*In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011) (quoting *Wichinsky v. Mosa*, 847 P.2d 727, 729–30 (Nev. 1993)).

Kurian contends that SNAPS intentionally interfered with his prospective economic gain when they sent an email to Full Spectrum LLC informing them that SNAPS had purchased, rather than leased, Kurian's spectrum. (Kurian First Post-Trial Br. 7:3–4, ECF 215). He asserts that, as a result of this misrepresentation, Kurian was unable to sell or lease his spectrum to another potential customer, Idaho Power. (*Id.* 7:7–11). Kurian cannot succeed on this claim because he failed to offer any evidence that SNAPS had knowledge of the prospective relationship between him and Idaho Power or an intent to harm Kurian by preventing the relationship. Furthermore, Kurian testified that Idaho Power did not want to buy the spectrum because Kurian and SNAPS were involved in litigation over the spectrum, which undermines his position that SNAPS' past misrepresentation was the reason Idaho Power did not want to purchase the spectrum. (Day 2 Tr. 126:3–20). Thus, Kurian failed to meet his burden of proving each element of his claim for intentional interference with prospective economic gain.

**3. Breach of the Implied Covenant of Good Faith and Fair Dealing**

A covenant of good faith and fair dealing is implied in all Nevada contracts. *Nelson v. Heer*, 163 P.3d 420, 427 (Nev. 2007). To succeed on his cause of action for breach of the covenant of good faith and fair dealing, Kurian must show that: (1) he and SNAPS entered into a valid contract; (2) Kurian performed all, or substantially all, of his obligations pursuant to the contract; (3) SNAPS performed in a manner that was unfaithful to the purpose of the contract, or deliberately contravened the intention and spirit of the contract; and (4) SNAPS' conduct was a substantial factor in causing damage to Kurian. *See Perry v. Jordan*, 900 P.2d 335, 338 (Nev. 1995).

In its Order on Summary Judgment, the Court previously granted summary judgment in favor of Kurian on this claim. (Order Summ. J. 12:15–15:2, ECF No. 55). The Court then vacated that grant of summary judgment, explaining:

> At summary judgment, the Court concluded that SNAPS breached the implied covenant of good faith and fair dealing because it failed to build out the infrastructure to provide substantial service. (Order Summ. J. 13:15–22). But, as was made clear at trial, the Spectrum Agreement between the parties specifically required SNAPS to provide substantial service. (Spectrum Agreement § 6(b), Plaintiff's Tr. Ex. 1). Because a claim for breach of the implied covenant of good faith and fair dealing "requires literal compliance with the terms of the contract," and SNAPS was required by the Agreement to provide substantial service, its alleged failure to provide substantial services would not constitute "literal compliance with the terms of the contract." *See Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922–23 (Nev. 1991). SNAPS' failure to provide substantial service therefore cannot constitute a breach of the implied covenant of good faith and fair dealing. *See id*.

Entering the second part of trial, Kurian continued to argue that SNAPS' failure to provide substantial service constitutes a breach of the covenant of good faith and fair dealing. (Kurian Second Opening Trial Br. 5:21–7:7). He argued at trial that SNAPS' actions defeated the purpose of the contract by failing to relieve Kurian's duties and obligations to the FCC. As the Court explained in its prior Order vacating summary judgment, Kurian is arguing that SNAPS did not comply with the requirements of the agreement by failing to provide substantial service. Because a claim for breach of the implied covenant of good faith and fair dealing requires literal compliance with the contract, SNAPS' noncompliance with the terms of the contract cannot support this claim. Accordingly, Kurian has failed to meet his burden on this claim.

**B. SNAPS' Counterclaims**

SNAPS proceeded to trial on the following counterclaims: (1) Fraudulent Misrepresentation, (2) Negligent Misrepresentation and Fraudulent Inducement, (3) Breach of the Covenant of Good Faith and Fair Dealing, and (4) Tortious Interference with Prospective Economic Advantage.

**1. Fraudulent and Negligent Misrepresentation**

In order to succeed on a fraudulent misrepresentation claim, SNAPS has the burden of proving each of the following elements by clear and convincing evidence: "(1) a false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998). Similarly, to succeed on its negligent misrepresentation claim, SNAPS must show by clear and convincing evidence that: (1) the defendant made a representation; (2) while in the course of his business, profession, employment or other action of pecuniary interest; (3) the defendant failed to exercise reasonable care or competence in obtaining or communicating the representation to the plaintiff; (4) the representation was false; (5) the representation was supplied for the purpose of guiding the plaintiff in its business transactions; (6) the plaintiff justifiably relied on the false information; and (7) the plaintiff sustained a loss due to the false information. *Bill Stremmel Motors, Inc. v. First Nat. Bank of Nevada*, 575 P.2d 938, 940 (Nev. 1978).

SNAPS asserts two different instances of alleged fraudulent misrepresentations: (1) Kurian falsely represented that he would satisfy the substantial service agreement, and (2) Kurian falsely denied ongoing negotiations with railroad buyers. The first instance relies entirely on the existence of the "side agreement" between the parties. The Court finds, however, that there was not sufficient evidence presented at trial to conclude that this side agreement did in fact exist. Patel's claims regarding the existence of the side agreement were not corroborated by any other supporting evidence. Thus, SNAPS' first basis for its fraudulent misrepresentation claim is unsuccessful.

The second allegation of misrepresentation is based on Kurian's statement to SNAPS that he had no plans to sell any portion of the spectrum to PTC. Kurian made this statement on August 30, 2018. (August 2018 Email, Def.'s Trial Ex. 126). SNAPS asserts that this statement was knowingly false because Kurian was simultaneously entertaining offers from PTC-220 to sell the same spectrum he had leased to SNAPS. But SNAPS fails to put forth any evidence conclusively showing that Kurian was entertaining offers by August 30, 2018. The first email in evidence about a potential sale of spectrum between Kurian and PTC-220 is dated October 17, 2018, about a month and a half after Kurian made the statement to SNAPS. (October 2018 Email, Def.'s Trial Ex. 108). Based on the evidence, it is possible that Kurian's statement was in fact true on August 30. Without evidence demonstrating that Kurian's statement was actually false at the time he made it, the Court finds that SNAPS failed to meet its burden of proving its fraudulent misrepresentation claim. Because the falsity of the statement is also a required element for a negligent misrepresentation claim, the Court also finds that SNAPS failed to meet its burden on that claim.

**2. Breach of the Covenant of Good Faith and Fair Dealing**

As explained above, to succeed on this claim, SNAPS must show that: (1) it and Kurian entered into a valid contract; (2) SNAPS did all, or substantially all, of its obligations pursuant to the contract; (3) Kurian performed in a manner that was unfaithful to the purpose of the contract, or deliberately contravened the intention and spirit of the contract; and (4) Kurian's conduct was a substantial factor in causing damage to SNAPS. *See Perry*, 900 P.2d at 338. A party breaches the covenant when it performs in a manner that is unfaithful to the contract's purpose and, thus, denies the other party's justified expectations. *Id*. Justified expectations are "determined by the various factors and special circumstances that shape these expectations." *Id.* (quoting *Hilton Hotels*, 808 P.2d at 924).

The parties do not dispute that the first element of this claim is met. And, as explained in the breach of contract analysis above, Kurian has not shown that SNAPS breached the contract. The Court therefore finds that SNAPS has satisfied the second element because it has shown it did all, or substantially all, of its obligations pursuant to the contract. The elements at issue here are thus the third and fourth: whether Kurian deliberately contravened the intention and spirit of the contract, and whether his conduct was a substantial factor in causing damages to SNAPS.

SNAPS argues that these elements were met when Kurian terminated the parties' agreement on false pretenses to facilitate a sale to a third party (PTC-220). On October 17, 2018, Kurian told PTC-220 via email that he currently had "a lease for the enter [sic] band with SNAP Holding." (October 17 Email, Def.'s Trial Ex. 108 at 2). He explained that he was "in the process of terminating the lease and hence the lease will not be a factor in this sale," and clarified that he would "cancel the existing lease with SNAP Holding before we enter into any type of sales/lease agreement with PTC." (*Id.*).

Approximately five months later, on March 20, 2019, Kurian sent Patel an email informing him that he was going to cancel the lease and sue him for breach of contract. (March 20 Emails, Def.'s Trial Ex. 123). The next day, Kurian clarified that he would terminate the lease if Patel did not send seven identified documents regarding substantial service "immediately." (*Id.*). He offered to "agree to terminate the Agreement mutually" if SNAPS agreed to pay the remaining lease amount of $ 1,420,320.82 and reimburse the cost of the equipment to provide substantial coverage until May 2024. (*Id.*). Five days later, without notice to SNAPS, Kurian applied to the FCC to cancel SNAPS' Lease of the Spectrum License. (Kurian Dep., Def's Trial Ex. 116 at 178). The next day, Kurian sent SNAPS a letter terminating the Agreement. (Termination Letter, Def.'s Trial Ex. 122). In that letter, Kurian stated that he was terminating the lease because SNAPS was failing to provide substantial

service, make timely payments, and arrange for a joint site inspection of all their sites. (*Id.*).[4] Important to SNAPS' claim is the purchase option contained in the parties' agreement that gave SNAPS the option to purchase the spectrum from Kurian for a set price any time after May 21, 2015. (Agreement ¶ 3, Pl.'s Trial Ex. 1). According to SNAPS, when Kurian terminated the lease in bad faith and under false pretenses, he also removed SNAPS' option to purchase.

Based on the evidence presented at trial, the Court finds that SNAPS has proven that Kurian deliberately contravened the intention and spirit of the contract when he terminated the parties' agreement on false pretenses. SNAPS entered into the lease in reliance on the purchase option; Patel testified at trial that SNAPS would not have entered into the lease if it did not give SNAPS the option to purchase. (Day 5 PM Tr. 68:3–8; 68:22–69:1). The parties entered into the agreement with an understanding that SNAPS was investing a large amount of time and money into the technology needed to operate. Patel credibly testified during the second part of trial that SNAPS invested around $40 million dollars into developing the technology related to this lease. Kurian terminated the agreement based on SNAPS' alleged breaches that Kurian has failed to prove were material. That termination, taken together with the documented ulterior motive of terminating SNAPS' lease to sell the spectrum to PTC-220 for a higher price, supports a finding that Kurian deliberately contravened the parties' understanding that the contract would allow SNAPS to have long-term use of the spectrum to justify its investment in its technology. This conclusion also satisfies the fourth element: Kurian's decision to terminate the contract caused SNAPS to suffer significant damages in the form of lost investment. SNAPS spent five years and a significant amount of money developing technology to be able to operate on the spectrum, and Kurian took away its right to purchase it. Accordingly, the Court

[4] While the termination letter references a "final notice" that Kurian allegedly sent to SNAPS on January 8, 2019, neither party introduced that final notice into evidence.

finds that SNAPS has met its burden of showing that Kurian breached the covenant of good faith and fair dealing.

**3. Tortious Interference with Prospective Economic Advantage**

To succeed on its claim for interference with prospective economic advantage, SNAPS must show: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct." *In re Amerco*, 252 P.3d at 702–03 (quoting *Wichinsky*, 847 P.2d at 729-30).

SNAPS argues that all elements are satisfied because Kurian was aware that SNAPS was developing a commercial system and "pursuing future agreements" based on its rights under its lease. (SNAPS First Post-Trial Br. 43:19–20). But SNAPS failed to identify or put on any evidence of an actual prospective contractual relationship between it and a third party. The evidence did not go beyond a generalized plan for future business. A prospective relationship "must have had a reasonable probability of resulting in a contract or other economic benefit"; "[a] mere hope or possibility of a benefit is not enough to support liability." *Restatement (Third) of Torts: Liab. for Econ. Harm* § 18 cmt. d (A.L.I. 2020). Without evidence of a prospective relationship that was reasonably likely to result in a contract with a third party, SNAPS has failed to meet its burden to prove its tortious interference claim.

**C. Damages**

Because the Court concludes that Kurian has not proven any of his claims, he is not entitled to any damages. SNAPS is entitled to compensatory damages on its breach of covenant of good faith and fair dealing claim. *See Rd. & Highway Builders, LLC v. Northern Nev. Rebar, Inc.*, 284 P.3d 377, 382 (Nev. 2012) (citing *Hilton Hotels*, 862 P.2d at 1209) (stating that the duty of good faith and fair dealing is always imposed on the contracting parties

and becomes a part of the contract such that the remedy for the duty's breach is based on the contract). Compensatory damages in contracts cases "are awarded to make the aggrieved party whole and . . . should place the plaintiff in the position he would have been in had the contract not been breached." *Hornwood v. Smith's Food King No. 1*, 807 P.2d 208, 211 (Nev. 1991). This includes awards for lost profits or expectancy damages. *Colorado Env'ts v. Valley Grading*, 779 P.2d 80, 84 (1989) (adopting the test espoused in Restatement (Second) of Contracts § 347 (1979)). The party seeking compensatory damages bears the burden of demonstrating the amount of those damages. *Clark Cty. Sch. Dist. v. Richardson Constr., Inc.*, 168 P.3d 87, 97 (Nev. 2007). "Although the amount of damages need not be proven with mathematical certainty, testimony on the amount may not be speculative." *Id.* (internal footnote omitted). The party seeking damages "must provide to the court an evidentiary basis upon which it may properly determine the amount" of their damages. *Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.*, 784 P.2d 954, 955 (Nev. 1989).

SNAPS does not seek damages for its lost profits—the type of damages that would perhaps most logically flow from Kurian's breach of the covenant of good faith and fair dealing. Instead, SNAPS asks for damages in the amount of the value of spectrum that Kurian's breach deprived them of. SNAPS explains that the value of the spectrum it lost can be calculated by subtracting what it would have paid for the full spectrum from the combined market value of both bands. According to SNAPS, the market value of the full spectrum can be calculated by doubling the amount the upper band was sold for ($11,575,930) for a total of $23,151,860. After subtracting the option purchase price of $10,194,996 that SNAPS would have paid, SNAPS would be awarded $12,956,864 in compensatory damages. This amount would represent the value of the spectrum that it would have received had it been able to exercise its purchase option.

The Court agrees that SNAPS' purchase option was for both bands, and Kurian sold the upper band for $11,575,930. Because both bands were subject to the same regulatory framework at the time Kurian ended the lease, the Court finds that the PTC-220 sale provides a reliable measure of the economic position SNAPS would have held if Kurian had not prevented SNAPS from exercising the purchase option. Based on the PTC-220 sale amount, the fair market value of the entire license at the time of termination was approximately $23,151,840. At the time of termination, the difference between the fair market value of the entire license and SNAPS' option price was $12,956,844. This amount represents the economic value SNAPS would have obtained through performance of the purchase option. Thus, the Court concludes that SNAPS has met its burden of proving compensatory damages in the amount of $12,956,844.

**ORDER**

The Court notes that the parties made several arguments and cited several cases not discussed above. The Court reviewed these arguments and cases and determines that they do not warrant discussion as they do not materially affect the outcome of this case.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that judgment is entered in favor of SNAPS Holding Company and against Thomas Kurian.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that SNAPS Holding Company is awarded damages in the amount of $12,956,844.

The Clerk of Court is kindly directed to enter judgment accordingly and close this case.

**DATED** this 21 day of August, 2026.

Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT